UNPUBLISHED

COURT OF APPEALS OF VIRGINIA

Present: Judges Russell, Friedman and Callins
Argued at Roanoke, Virginia

CHERYL JONES

v.      Record No. 0687-21-3

ROANOKE CITY DEPARTMENT
 OF SOCIAL SERVICES                          MEMORANDUM OPINION* BY
                                            JUDGE DOMINIQUE A. CALLINS
MARIAH RODRIGUEZ ROBERTS                          MAY 31, 2022

v.      Record No. 0853-21-3

ROANOKE CITY DEPARTMENT
 OF SOCIAL SERVICES


FROM THE CIRCUIT COURT OF THE CITY OF ROANOKE
Onzlee Ware, Judge

(Rhonda L. Overstreet; Overstreet Sloan, PLLC, on briefs), for
appellant Cheryl Jones.

John S. Koehler (Stephen H. Kennedy; The Law Office of James
Steele, PLLC, on briefs), for appellant Mariah Rodriguez Roberts.

Jennifer L. Crook, Assistant City Attorney (Timothy R. Spencer,
City Attorney; Diana M. Perkinson, Guardian *ad litem* for the minor
children, on brief), for appellee.


Mariah Rodriguez Roberts ("mother") and Cheryl Jones ("grandmother") appeal the circuit

court's order terminating mother's parental rights to L.A.R. and B.R.K. under Code § 16.1-283(B)

and (C)(2) and approving the foster care goal of adoption. Mother argues that the circuit court erred

in finding that the termination of her parental rights was "appropriate and necessary." Grandmother

also challenges the circuit court's finding that the termination of mother's parental rights was

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

"appropriate and necessary" because "in so doing [the circuit court was] terminating [grandmother's] custodial rights to the children." Both mother and grandmother assert that the circuit court erred by "failing to give proper consideration to a family placement and adoption of the children by [the grandmother], . . . which would have been in the best interest of the children." We find no error and affirm the judgment of the circuit court.

BACKGROUND[1]

"On appeal from the termination of parental rights, this Court is required to review the evidence in the light most favorable to the party prevailing in the circuit court." *Yafi v. Stafford Dep't of Soc. Servs.*, 69 Va. App. 539, 550-51 (2018) (quoting *Thach v. Arlington Cnty. Dep't of Hum. Servs.*, 63 Va. App. 157, 168 (2014)). Here, the Roanoke City Department of Social Services ("DSS" or the "Department") was the prevailing party.

In 2017, mother and grandmother shared custody of then-two-year-old L.A.R. Grandmother "expressed concerns" to DSS about L.A.R. visiting mother, and DSS received multiple reports alleging physical neglect, poor hygiene, lack of supervision, substance abuse, and physical abuse. Beginning December 3, 2017, DSS received multiple complaints relating to L.A.R. The initial call communicated concern of possible sexual abuse to L.A.R. Two days later, DSS received another complaint explaining that L.A.R. was sent to the hospital because of "a history with bedbugs and having to have shots for rabies." The Department received several more complaints in January and April 2018 about lack of supervision. Then, on July 20, 2018, DSS received another complaint suggesting that mother was using LSD and her boyfriend was

---

[1] The record was sealed. That said, these appeals require unsealing relevant portions of the record to resolve the issues appellants have raised. Evidence and factual findings below necessary to address the assignments of error are included in this opinion. Consequently, "[t]o the extent that this opinion mentions facts found in the sealed record, we unseal only those specific facts, finding them relevant to the decision in this case. The remainder of the previously sealed record remains sealed." *Levick v. MacDougall*, 294 Va. 283, 288 n.1 (2017).

using marijuana and cocaine around L.A.R.  The complainant said that the boyfriend was violent with L.A.R., reportedly yelling at her and striking her repeatedly.  The complainant also believed that L.A.R. was starving.

In January 2019, DSS received another report alleging physical neglect and sexual abuse of L.A.R.  After investigating the matter, DSS entered a safety plan with mother that prohibited her boyfriend from having contact with the child.[2]  The Department later learned that mother's boyfriend had been under investigation for having sexual contact with another child.  A forensic nurse examined L.A.R., but because of L.A.R.'s age and developmental level, the exam could not be completed, so "there were no definitive findings and therefore the exam did not confirm or refute the allegations of sexual abuse."  Meanwhile, DSS learned that grandmother had suspected that L.A.R. had been sexually abused and had taken L.A.R. for forensic evaluations, which did not show any evidence of sexual abuse.  During its investigation, DSS further discovered that grandmother had taken L.A.R. to the doctor or hospital forty-four times between October 2016 and March 2019.

The Department sought an *ex parte* preliminary protective order for L.A.R. given the sexual abuse allegations, mother's denial of the sexual abuse allegations concerning L.A.R., mother's desire to continue her relationship with her boyfriend, an individual suspected of sexual abuse of L.A.R., and grandmother repeatedly subjecting L.A.R. to "intrusive" forensic exams. At the hearing, DSS's petition for a protective order was amended to a petition for removal of L.A.R.  On March 6, 2019, the City of Roanoke Juvenile and Domestic Relations District Court ("JDR court") entered an emergency removal order, and after, entered a preliminary removal order.  The JDR court adjudicated that L.A.R. had been abused or neglected and entered a

---

[2] Mother had requested that her boyfriend be allowed to live in the home when L.A.R. was not present because mother was pregnant with his child, B.R.K.

dispositional order. The JDR court allowed mother and grandmother supervised visitation at DSS's discretion but prohibited mother's boyfriend from having any contact with L.A.R.

Approximately one month after L.A.R.'s removal, mother gave birth to B.R.K., who entered foster care a few days after he was born. DSS placed B.R.K. in the same foster home as L.A.R. The JDR court adjudicated that B.R.K. was abused or neglected and entered a dispositional order.

Upon the children's entry into foster care, DSS required that mother and grandmother meet certain goals before reunification could be achieved. Mother had to "address the concerns" and allegations that her boyfriend had sexually abused L.A.R. Mother also had to "demonstrate protective parental capacity and prevent contact between [L.A.R.] and individuals suspected, or known, to have a history of child abuse." Furthermore, mother and grandmother had to "address their communication issues," stop arguing in front of L.A.R., establish appropriate parenting skills, maintain safe and stable housing, maintain financial stability, and show that they could address L.A.R.'s medical needs "appropriately."

The Department referred mother and grandmother to parenting classes, individual and family counseling, and a psychological evaluation. Mother and grandmother each completed parenting classes and participated in individual counseling. While mother claimed that she was no longer in a relationship with her boyfriend, she gave DSS and the court-appointed special advocate ("CASA") "the impression that she intend[ed] to resume the relationship" once the foster care matter ended. Mother refused to acknowledge "the possibility of abuse" and did not recognize that her boyfriend was a risk to the children. Grandmother also refused to acknowledge the impropriety of subjecting L.A.R. to "excessive doctor's visits and invasive examinations."

Throughout DSS's involvement with the family, mother and grandmother had "a very strained and contentious relationship." Grandmother doubted whether mother could change, and mother was "reluctant to rebuild a relationship" with grandmother due to their unstable history. Mother and grandmother each reported that they thought it would be better for the children to remain in foster care than return to the other's custody. Both DSS and the CASA remained skeptical about their ability to co-parent. The Department noted that mother needed to stop putting "desire to win against [grandmother]" ahead of the emotional needs of her children.

Both mother and grandmother completed psychological evaluations with Dr. Klaire Mundy. Dr. Mundy was concerned about the "caustic and negative interpersonal interaction" between mother and grandmother, which could cause the children "significant confusion and emotional disruption." Dr. Mundy recommended that both mother and grandmother participate in an attachment assessment, individual counseling, and family counseling. Dr. Mundy also recommended a psychiatric evaluation for mother.

Mother and grandmother participated in an attachment assessment with Sharon Brammer, LPC. Brammer was "extremely concerned" that mother was in "complete denial" about her boyfriend's alleged abuse of L.A.R. Brammer was also "very concerned" about grandmother's "lack of honesty regarding her own past trauma," which impacted her ability to address L.A.R.'s trauma. Brammer determined that L.A.R. did not have a "secure attachment" with mother or grandmother, and B.R.K. had "no attachment" with mother or grandmother. Brammer recommended that mother and grandmother participate in trauma therapy, individual and group therapy, and "attachment altering therapy." Brammer opined that it would take at least one year for mother and grandmother to complete all recommendations.

During the attachment assessments, Brammer also determined that L.A.R. tested in the ninety-ninth percentile for a child who had been sexually abused and in the ninety-ninth

percentile for a child who had post-traumatic stress disorder. Brammer recommended that L.A.R. have no contact with her alleged abuser and was concerned about L.A.R.'s ongoing contact with mother and grandmother.

Grandmother subsequently participated in another attachment assessment with a different evaluator, Dr. William Whelan. Dr. Whelan found that B.R.K. was "not yet fully attached" to grandmother, although L.A.R. was attached. Dr. Whelan further opined that the "risks to the children will likely increase, and perhaps become high, as they get older and begin to have more of their own minds, opinions, and disagreements with [grandmother]." Those potential risks included "problems in emotion and behavior regulation, in peer relationship development and maintenance, partnership behavior, trouble with authority figures, and psychiatric disorders." Dr. Whelan recommended that grandmother participate in individual psychotherapy.

Along with the evaluation referrals, DSS arranged for visitation between the children and mother and grandmother. Mother and grandmother's visits started in DSS's office and progressed to community visits. Mother regularly attended the visitations and acted in a "loving, nurturing manner." As B.R.K. became "more active," however, mother demonstrated that she had "difficulty relating to, and interacting with, both children at the same time." Grandmother also regularly attended the visitations and acted in a "very loving manner" toward L.A.R., but she at first had "no relationship with [B.R.K.] and [did] not interact with him." Grandmother became more involved with B.R.K. during visits and petitioned for custody and visitation of him.[3] Grandmother also struggled to interact with both children at the same time and "often discounted or deflected the suggestions made to her by the parenting coach."

The foster parents reported that L.A.R. displayed "increased anxiety," "difficult behaviors," and nightmares after her visits with mother and grandmother. To address her anxiety

---

[3] The JDR court denied grandmother's petitions for custody and visitation of B.R.K.

and trauma, L.A.R. participated in play therapy.  In November 2019, L.A.R.'s therapist suggested reducing the visitation to biweekly visits to determine whether visits with mother or grandmother caused L.A.R. stress.  The team, however, was "unable to see much difference in [L.A.R.'s] reactions after visits, except that the adjustment period directly following visits was longer after [mother's] visits."  Following the advice of Brammer and L.A.R.'s therapist, DSS suspended mother's visits on November 16, 2019.  Grandmother was still allowed to visit L.A.R. biweekly, but "[L.A.R.] . . . still displayed many stressors surrounding visits.  She would have nightmares, bed wetting, and tantrums in anticipation of [grandmother's] visit."  But "once her foster parents informed her there was no visit she would immediately calm down and have a wonderful week."  Grandmother's visitation with L.A.R. continued until mid-February 2020, when DSS suspended her visits.[4]  After the suspension of the visits, L.A.R. made "vast improvements" in her behavior and "good progress in therapy."  B.R.K. also was doing well in foster care and met his developmental milestones.  Both children bonded to each other and their foster parents.

In contrast, grandmother's behavior deteriorated after visitation was suspended, and grandmother's therapist discharged her from therapy due to her "negativity."  L.A.R.'s therapist barred grandmother from her office after grandmother sent emails and went to the therapist's office, accusing the therapist of lying.  Mother and grandmother began family therapy but were discharged after a couple of months due to grandmother's "continued increase of hostility."

The Department sought to change the goal to adoption because of mother's relationship with her boyfriend, her refusal to recognize that her boyfriend was a risk to her children, and her inability to recognize the possibility of abuse.  Mother "continue[d] to struggle with taking

---

[4] Although DSS did not suspend grandmother's visitation with B.R.K., she did not request visits with him after the suspension of her visits with L.A.R.

responsibility for her actions" and "putting her children's needs before her own."  The

Department also remained concerned about mother's "extremely strained" relationship with

grandmother.  It found that grandmother also was not a viable placement because she refused to

acknowledge how and why subjecting L.A.R. to "excessive doctor's visits and invasive

examinations" hurt the child.  The Department was also alarmed by grandmother's "extremely

concerning behavior and lack of coping skills."

On June 25, 2020, the JDR court terminated mother's parental rights and approved the

foster care goal of adoption for both children.[5]  Mother appealed the JDR court's rulings, and

grandmother appealed the approval of the foster care plans.

After hearing evidence and arguments for two days, the circuit court terminated mother's

parental rights under Code § 16.1-283(B) and (C)(2) and approved the foster care goal of

adoption for L.A.R. and B.R.K.[6]  These appeals followed.

ANALYSIS

I.  Termination of Parental Rights

A.  Grandmother's Standing to Challenge Termination of Mother's Parental Rights

Grandmother appealed the circuit court's termination of mother's parental rights,

contending that "in so doing [the circuit court was] terminating [her] custodial rights to the

children."[7]  The Department argues that grandmother lacks standing to appeal the termination of

---

[5] On August 19, 2020, the JDR court terminated the parental rights of L.A.R.'s biological father and B.R.K.'s biological father.  There is nothing in this record that shows that either biological father appealed these terminations.

[6] The circuit court entered the final order on June 11, 2021.  The transcripts for the circuit court hearing were filed late on August 13, 2021.  Thus, they are not part of the record.  *See* Rule 5A:8(a).

[7] Grandmother explains in her brief that she "does not contest the termination of [mother's] parental rights with respect to the [Department's] petition against mother," but argues

mother's parental rights because grandmother has no basis to assert mother's parental rights nor does grandmother possess her own, independent legal right to custody of a child.

"Issues of standing are questions of law that this Court reviews *de novo*." *Tackett v. Arlington Cnty. Dep't of Hum. Servs.*, 62 Va. App. 296, 325 (2013) (citing *Kelley v. Stamos,* 285 Va. 68, 73 (2013)). In *Tackett*, we held that appellant, a grandmother who had legal custody and guardianship of a child, "did not have any legal right" to challenge a termination of the mother's parental rights. *Id.* "Simply put, 'one cannot raise third party rights.'" *Id.* (quoting *DePriest v. Commonwealth*, 33 Va. App. 754, 761 (2000)). And although exceptions to the standing rule exist, *see id.*, none are present here. As a nonbiological parent, and absent any adoption, grandmother has no "custodial rights" apart from those granted to her by a court of competent jurisdiction after consideration of a properly pled petition. Accordingly, we agree that grandmother lacks standing to appeal the termination of mother's parental rights.

B. <u>Clear and Convincing Evidence to Support Termination of Mother's Parental Rights</u>

Mother also challenges the circuit court's termination of her parental rights. In reviewing a judgment of termination of parental rights, we presume the circuit court "ha[s] thoroughly weighed all the evidence, considered the statutory requirements, and made its determination based on the child's best interests." *Castillo v. Loudoun Cnty. Dep't of Fam. Servs.*, 68 Va. App. 547, 558 (2018) (quoting *Logan v. Fairfax Cnty. Dep't of Hum. Dev.*, 13 Va. App. 123, 128 (1991)). "Where, as here, the court hears the evidence *ore tenus*, its finding is entitled to great weight and will not be disturbed on appeal unless plainly wrong or without evidence to support it." *Fauquier Cnty. Dep't of Soc. Servs. v. Ridgeway*, 59 Va. App. 185, 190 (2011) (quoting *Martin v. Pittsylvania Cnty. Dep't of Soc. Servs.*, 3 Va. App. 15, 20 (1986)). As factfinder, the

---

that the termination of mother's parental rights "resulted in the improper termination of [her] custodial rights and the concomitant denial of her petitions to adopt the children."

circuit court has "broad discretion in making the decisions necessary to guard and to foster a child's best interests." *Toms v. Hanover Dep't of Soc. Serv*s., 46 Va. App. 257, 266 (2005) (quoting *Farley v. Farley*, 9 Va. App. 326, 328 (1990)).  It is through this lens that we consider the ruling of the lower court.

The circuit court terminated mother's parental rights under Code § 16.1-283(B) and (C)(2).  Under subsection B of the statute, a court may terminate the parental rights of the parent of a child found to be neglected or abused and placed in foster care if the neglect or abuse (1) presents a serious and substantial threat to the life, health, or development of the child and, (2) it is not reasonably likely that the abusive or neglectful conditions can be substantially corrected or eliminated within a reasonable time.  Code § 16.1-283(B).

> Because "the rights of parents may not be lightly severed," *M.G. v. Albemarle County Dep't of Soc. Servs.*, 41 Va. App. 170, 187, (2003) (citation omitted), clear and convincing evidence must establish the statutory grounds for termination.  *Fields*[ *v. Dinwiddie Cty. Dep't of Soc. Servs.*], 46 Va. App. [1,] 7 [(2005)]. In the end, the "child's best interests" remain the "paramount consideration" of the court.  *Akers v. Fauquier County Dep't of Soc. Servs.*, 44 Va. App. 247, 262 (2004) (citation omitted).  Even on this issue, however, we cannot "substitute our judgment" for the circuit court's, *Ward v. Commonwealth*, 13 Va. App. 144, 148 (1991), but rather review the record only to determine if sufficient evidence supports it.

*Toms*, 46 Va. App. at 266-67.  So the issue before us is whether the record supports the circuit court's finding that termination was in the best interests of L.A.R. and B.R.K.  We hold that it does.

Contrary to mother's contention, the record contains factual support for termination under Code § 16.1-183(B).  The Department presented evidence that it began investigating reports of physical abuse and neglect of L.A.R. in 2017.  These complaints alleged that L.A.R. had described her privates hurting, that she was seen starving and dehydrated, and that mother's boyfriend had struck her repeatedly.  In 2019, DSS received a report alleging that mother's

boyfriend had sexually abused L.A.R. Mother continually denied the allegations and did "not appear to be protective of [L.A.R.] regarding the allegations of sexual abuse." After the JDR court ordered DSS to place L.A.R. in foster care, mother refused to acknowledge that the abuse could have occurred, despite test results from psychologists that placed L.A.R. "in the 99th percentile for a child that has been sexually abused and . . . has PTSD."[8] About a month after L.A.R.'s placement, B.R.K. was born and placed in foster care. The JDR court adjudicated both children abused or neglected and entered adjudication and dispositional orders, which, notably, mother did not appeal. The Department also presented evidence that L.A.R. had shown "an escalation of behaviors before and after visitation" with both mother and grandmother, jointly and separately. Both Brammer and L.A.R.'s therapist recommended suspending mother's visitations with L.A.R. After DSS did so, L.A.R.'s behaviors drastically improved. The evidence presented at trial supported the finding that each child faced a serious and substantial risk to their lives, health, and development in mother's continued custody.

The record supports the conclusion that the conditions supporting the abuse and neglect finding could not be remedied within a reasonable time. Code § 16.1-283(B)(2). Indeed, they had not. The family has been entangled with DSS since 2017. At the time of the circuit court hearing, L.A.R. had been in foster care for about two years, and B.R.K. had been in foster care his entire life. The Department offered many services to mother, including referrals for a psychological evaluation and attachment assessment. Both evaluators brought up mother's "lack of insight" into how her choices affect her children, as well as her inability to protect them. Mother remained in "complete denial" about L.A.R.'s exposure to sexual abuse. Both evaluators

---

[8] Mother argues, and the record establishes, that mother's boyfriend was not charged with a criminal offense related to sexual abuse of a child and that DSS ultimately concluded that the allegations of sexual abuse by the boyfriend were "unfounded." Yet it remained undisputed that the evidence supported that L.A.R. suffered trauma related to persistent sexual abuse by someone, a finding mother continued to deny.

recommended counseling and treatment and opined that it could be at least one year before mother could complete the recommended therapy.

Mother argues that the record shows "progress in healing that rift" between her and grandmother. But this conclusion contradicts the evidence. The record shows that mother had not resolved her issues with grandmother and that she could not resume custody of the children given the posture of her own therapeutic process. The circuit court, noting that "time is of the essence," acknowledged that mother's rehabilitation would take some time, but declined to "sacrifice [the children] to let [mother and grandmother] catch up" given how long the children had been in foster care. We cannot say this decision of the circuit court was plainly wrong or unsupported by the evidence. As we have acknowledged, "[i]t is clearly not in the best interests of a child to spend a lengthy period of time waiting to find out when, or even if, a parent will be capable of resuming his [or her] responsibilities." *Tackett*, 62 Va. App. at 322 (quoting *Kaywood v. Halifax Cnty. Dep't of Soc. Servs.*, 10 Va. App. 535, 540 (1990)). Accordingly, the circuit court did not err in terminating mother's parental rights under Code § 16.1-283(B).

"When a lower court's judgment is made on alternative grounds, this Court need only determine whether any of the alternatives is sufficient to sustain the judgment." *Castillo*, 68 Va. App. at 574 n.9; *see also Fields*, 46 Va. App. at 8 (affirming termination of parental rights under one subsection of Code § 16.1-283 and declining to address termination of parental rights under another subsection). We find that the record contains sufficient evidence to support the judgment of the circuit court terminating mother's parental rights under Code § 16.1-283(B). We therefore do not need to reach whether the evidence also supports the termination of mother's parental rights under Code § 16.1-283(C)(2).

II. Placement with Grandmother

Both mother and grandmother contend that the circuit court erred in approving the foster care goal of adoption, rather than consider grandmother as a relative placement under Code § 16.1-283(A). Grandmother specifically asserts that she "contests only the separate judgment of the circuit court denying her petitions for custody and a family-adoption of the minor children." But grandmother acknowledges it was the JDR court that denied her petitions for custody and visitation of B.R.K. It does not appear from the record that grandmother appealed the JDR court's rulings, so those rulings are final. *See* Rule 1:1. Further, the record does not reflect that grandmother petitioned to adopt the children.

Code § 16.1-283(A) provides that a "court shall give a consideration to granting custody to a person with a legitimate interest . . . ."[9] We have "held that this provision obligates [DSS] 'to produce sufficient evidence so that the court may properly determine whether there are relatives willing *and suitable* to take custody of the child, and to consider such relatives *in comparison to other placement options*.'" *Castillo*, 68 Va. App. at 567 (emphasis added) (quoting *Brown v. Spotsylvania Dep't of Soc. Servs.*, 43 Va. App. 205, 217 (2004)). Upon review of the record, the circuit court properly considered grandmother's suitability as a placement option for the children, and concluded the evidence found grandmother wanting.

At trial, DSS established that it first sought relative placement with grandmother as a concurrent foster care goal to its main goal of returning the children home. In its efforts to reunite the children with grandmother, DSS offered her many services, including referrals for a psychological evaluation, an attachment assessment, and counseling. But service providers

---

[9] Code § 16.1-283(A) also provides that "if custody is not granted to a person with a legitimate interest, the judge shall communicate to the parties the basis for such decision either orally or in writing." Neither mother nor grandmother raises this as an issue, so we will not address it.

- 13 -

ultimately discharged grandmother from counseling due to her behavior and her hostility toward the services and service providers. Despite all the services offered, grandmother refused to acknowledge her role in the children's placement in foster care. Moreover, visitation between grandmother and the children ceased so that she had not seen the children for a long time. The evidence showed that both children, but particularly L.A.R., did much better without any contact with grandmother and that they were well-adjusted with their foster family.

Considering the record before us, the evidence supports that it was in the children's best interests not to place the children with grandmother, and instead, to approve the foster care goal of adoption. When the evidence supports the circuit court's judgment, this Court "does not disturb the circuit court's ruling that no relatives were suitable placements." *Castillo*, 68 Va. App. at 568.

CONCLUSION

For the foregoing reasons, the circuit court's ruling is affirmed.

*Affirmed*.